IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ERIC STARKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:24-cv-684-CWB |
| ) | |
| PENSKE TRUCK LEASING ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

This is an employment discrimination action brought by Eric Starks ("Starks") to assert claims arising out of his former employment with Penske Truck Leasing Co., L.P. ("Penske").[1] Starks has purported to assert claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). (*See* Doc. 1). Penske in turn is seeking the dismissal of all such claims. (*See* Doc. 11). Upon careful review and consideration, the court concludes that the requested dismissal is due to be granted.[2]

---

[1] Starks appears to have misidentified Penske as "Penske Truck Leasing Corporation." (*See* Doc. 1 at pp. 1-3).

[2] The court finds that it has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Personal jurisdiction and venue are not contested, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391; Fed. R. Civ. P. 4(k)(1)(A). And all parties previously consented to the exercise of dispositive jurisdiction by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (*See* Docket Entry on December 13, 2024).

II.     **Factual Allegations and Procedural Background**[3]

Starks is a forty-seven-year-old African American male who was employed by Penske for approximately eight years between 2015 and 2023—beginning as a Tech 3 in 2015 before being promoted to a Tech 2 in 2019 and then a Tech 1 in 2022. (Doc. 1 at ¶¶ 5-8). Problems began shortly after September 2021 when Penske transferred Dustin Ohlrogge, a Caucasian Tech 2, to work the same schedule as Starks. (*Id*. at ¶ 10). According to Starks, Ohlrogge began to exhibit a pattern of harassment toward him after learning about his history of promotions and compensation. (*Id*. at ¶ 11). Among the offending conduct were instances of slamming lockers and making grunting noises. (*Id*. at ¶¶ 12-13). Ohlrogge also allegedly excluded Starks from meetings and instructed coworkers to report problems with Starks to the three Caucasian techs. (*Id*. at ¶¶ 13-14).

Starks reported the perceived harassment and discrimination to Nathaniel Nale, who was the Day Shift Supervisor. (*Id*. at ¶ 15). Although Nale told Starks that he would "take care of it," Ohlrogge continued to treat him in the same manner. (*Id*. at ¶ 16). In late 2021, Starks and Ohlrogge were both sent home without pay for a "cooling off period." (*Id*. at ¶ 18).

Starks made a second complaint to Nale in April 2022—asserting that Ohlrogge was repeatedly placing scrap metal parts into Starks' toolbox. (*Id*. at ¶ 19). Following a subsequent incident in that regard, Starks provided a written statement to Nale about the behavior. (*Id*. at ¶¶ 20-21). Starks subsequently was contacted by a Human Resources associate named "Christina," to whom he repeated his complaints about the underlying harassment from Ohlrogge during the prior seven months. (*Id*. at ¶¶ 22-24). Christina "and/or others at Penske HR" informed Starks

---

[3] The "facts" stated herein are gleaned exclusively from the allegations in the Complaint, the contents of those documents properly annexed thereto, and matters of which judicial notice may be taken.

that "they had taken care of it" and that the harassment would stop. (*Id*. at ¶ 24). However, Ohlrogge's behavior toward Starks persisted. (*Id*. at ¶ 25).

Starks requested FMLA leave in December 2022 due to stress and medical conditions caused by "the ongoing harassment, discriminatory practices and mistreatment at work." (*Id*. at ¶ 31). Penske granted FMLA leave to Starks from December 16, 2022 through April 3, 2023. (*Id*. at ¶ 32).

But upon Starks' return to work, Ohlrogge "immediately began harassing" him again. (*Id*. at ¶ 33). Starks thereafter made "numerous reports" about the conduct to the Day Shift Supervisor, the Branch Service Manager, and the District Manager. (*Id*. at ¶ 34). Nonetheless, Ohlrogge's harassment continued. (*Id*. at ¶ 35). Starks further asserts that Ohlrogge "essentially monopolized" the diagnostic cart that Starks needed to perform his job duties (*id*. at ¶¶ 36-37) and that he was not provided computer equipment (*id*. at ¶¶ 38-40). Ohlrogge meanwhile was afforded use of the equipment and received training with pay. (*Id*. at ¶ 41). Starks at that point raised the issue of "white privilege" with Human Resources personnel in approximately April of 2023. (*Id*. at ¶¶ 42-43, 54). Starks also alleges that he was excluded from morning "coordination meetings" by the Branch Service Manager beginning in late 2022. (*Id*. at ¶¶ 26-29). The meetings apparently included all the Caucasian techs, the Caucasian male parts manager, and the Caucasian female maintenance coordinator. (*Id*. at ¶¶ 26-27). And Starks often would be assigned to work in Quick Service or instructed to handle repairs that had not been finished from the night before. (*Id*. at ¶ 30).

The situation reached a peak on August 24, 2023 when Ohlrogge threw a piece of metal exhaust pipe at Starks and then punched the breakroom door. (*Id*. at ¶ 45). Several hours later, Ohlrogge approached Starks in the bathroom and slammed his locker. (*Id*. at ¶ 46). Starks

reported the additional incidents to the Penske District Service Manager (*id*. at ¶¶ 47-48) and expressed to the Branch Service Manager that Ohlrogge's "constant harassment" was detrimentally affecting him mentally and physically (*id*. at ¶¶ 49-50).

The day after the exhaust pipe incident, Starks was interviewed about what happened. (*Id*. at ¶ 51). He reiterated his complaints from the prior two years and that nothing had been done to address them. (*Id*. at ¶¶ 52-53). Starks was informed the same day that he was being placed on administrative leave with pay until an investigation could be completed. (*Id*. at ¶ 55). He ultimately was informed on September 8, 2023 that his employment at Penske was terminated. (*Id*. at ¶ 57).

Starks submitted a formal Charge of Discrimination with the EEOC on October 5, 2023 alleging discrimination and retaliation due to race and age. (*Id*. at ¶ 60 & p. 25). The EEOC issued a Determination and Notice of Rights letter on August 7, 2024. (*Id*. at ¶ 61 & p. 31). This action was filed on October 28, 2024. (*See* Doc. 1).

### III.  Legal Standard

To survive a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, a plaintiff must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp., v. Twombly*, 550 U.S. 544, 570 (2007). The standard for such a motion was explained in *Twombly* and refined in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where

>the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

*Iqbal*, 556 U.S. at 678-79 (citations and internal edits omitted).

The *Twombly-Iqbal* two-step analysis begins "by identifying the allegations in the complaint that are not entitled to the assumption of truth" because they are conclusory. *Id.* at 680; *Mamani v. Berzain*, 654 F. 3d 1148, 1153 (11th Cir. 2011) ("Following the Supreme Court's approach in *Iqbal*, we begin by identifying conclusory allegations in the Complaint."). After conclusory statements are set aside, the *Twombly-Iqbal* analysis requires the court to assume the veracity of well-pleaded factual allegations and to determine whether they "possess enough heft to set forth 'a plausible entitlement to relief.'" *Mack v. City of High Springs*, 486 F. App'x 3, 6 (11th Cir. 2012) (citation omitted). Again, establishing facial plausibility requires more than stating facts that establish a mere possibility. *Mamani*, 654 F. 3d at 1156 ("The possibility that – *if* even a possibility has been alleged effectively – these defendants acted unlawfully is not enough for a plausible claim.") (emphasis in original). Plaintiffs instead are required to "allege more by way of factual content to nudge [their] claim[s] … across the line from conceivable to plausible." *Iqbal,* 556 U.S. at 683 (internal editing and citation omitted).

In ruling on a 12(b)(6) motion, a court generally may consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[A] court may consider a document attached to a motion to dismiss ... if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, 'undisputed' means that the authenticity of the document is not challenged. ... [A] document need not be physically attached to a pleading to be incorporated by reference into it;

5

if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document provided it meets the centrality requirement[.]") (citation omitted); Fed. R. Civ. P. 10(c).

The court must accept all of the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *See Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). And the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The court need not, however, accept as true any legal conclusions couched in the form of factual allegations. *See Diverse Power, Inc. v. City of LaGrange, Georgia*, 934 F.3d 1270, 1273 (11th Cir. 2019) (citing *Twombly*, 550 U.S. at 555).

**IV.    Discussion**

    **A.    Title VII Race Discrimination**

Starks alleges that he was discriminated against "with respect to his compensation, terms, conditions, and privileges of employment" on the basis of race in violation of Title VII of the Civil Rights Act of 1964. (*See* Doc. 1 at ¶ 67). To prevail on a claim for unlawful discrimination under Title VII, a plaintiff must show (1) that he is a member of a protected class, (2) that he was qualified for the position, (3) that he suffered an adverse employment action, and (4) that he was either replaced by a person outside his protected class or treated less favorably than a similarly situated individual outside his protected class. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 874 (11th Cir. 2013). While "[a] complaint in an employment discrimination case need not contain specific facts establishing a *prima facie* case under the evidentiary framework for such cases

to survive a motion to dismiss[,] ... complaints alleging discrimination still must meet the 'plausibility standard' of *Twombly* and *Iqbal*." *Henderson v. JP Morgan Chase Bank, N.A.*, 436 F. App'x 935, 937 (11th Cir. 2011) (internal citation omitted); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).  Thus, "[t]o state a race-discrimination claim under Title VII, a complaint [must] 'provide enough factual matter (taken as true) to suggest intentional race discrimination.'" *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (citations omitted).

The Complaint filed by Starks lacks sufficient factual allegations to state a plausible claim for race discrimination in Count One.  First, there is no indication in the Complaint that Starks suffered any type of alleged discrimination from the time of his 2015 hire through the time in September 2021 when Ohlrogge was transferred to the same shift.  Second, Starks fails to assert sufficient factual allegations that any conduct prior to his suspension and termination constituted an adverse employment action.  *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.") (citations omitted). For example, Starks does not allege how he was harmed from being assigned to Quick Service, or from handling repairs from the night before, or from Ohlrogge's "monopolizing" the diagnostic cart, or from a lack of training.  *See Gildyard v. Children's Network of Southwest Fla., LLC*, No. 2:24-CV-702, 2025 WL 1093331, *6 (M.D. Fla. Apr. 10, 2025) (dismissing Title VII claim due to the plaintiff's failure to allege conduct that constituted an adverse employment action); *Santiago v. Univ. of Miami*, No. 1:22-CV-23384, 2023 WL 3045417, *7 (S.D. Fla. Apr. 6, 2023), *report and recommendation adopted*, No. 22-CV-23384, 2023 WL 3043414 (S.D. Fla.

Apr. 21, 2023) ("[The plaintiff's] allegations of unfair work assignments and arbitrary disciplinary actions do not rise to the level of a tangible employment action necessary to state a discrimination claim."); *Rossi v. Fulton Cnty., Ga.*, No. 1:10-CV-4254, 2013 WL 1213205, *13 (N.D. Ga. Feb. 8, 2013) ("A denial of training that does not result in the loss of some tangible job benefit does not constitute an adverse action."), *report and recommendation adopted sub nom. Rossi v. Fulton Cnty. Bd. of Assessors/Fulton Cnty. Tax Assessors Off.*, No. 1:10-CV-4254, 2013 WL 1213139 (N.D. Ga. Mar. 22, 2013); *Stamps v. McDonough*, No. 1:21-CV-3562, 2022 WL 22893193, *17 (N.D. Ga. May 12, 2022) (finding that the plaintiff did not allege any facts to support claim that direct reports were "disproportionately" added to her workload or that she was given "unreasonable" tasks); *see also id.* ("[E]xclusion from meetings or events does not qualify as an adverse employment action absent evidence of tangible job consequences."); *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 800 (11th Cir. 2014) ("[B]ecause work assignment claims strike at the very heart of an employer's business judgment and expertise, absent unusual circumstances, they typically do not constitute adverse employment actions."). Rather than indicating any adverse consequences here, the allegations in the Complaint reflect that Starks was promoted to Tech 1 in mid-2022 during the midst of Ohlrogge's alleged conduct.

Perhaps most fundamentally, however, Starks does not allege sufficient factual grounds to support a plausible claim that any conduct was based upon his race. To the contrary, Starks' allegations reflect that issues with Ohlrogge did not arise until Ohlrogge became aware of Starks' history of promotions and earnings. (*See* Doc. 1 at ¶ 11). There are no facts alleged to suggest that Ohlrogge would have reacted differently to learning such information if Starks were of a different race. The same is true as to the ultimate termination of Starks' employment

by Penske. Nothing alleged factually in the Complaint suggests that Starks' termination was motivated even in part by race.[4]

For all of these reasons, the court concludes that Starks has not asserted a plausible claim for Title VII discrimination on the basis of his race. *See Jacobs v. Alorica*, No. 1:15-CV-850, 2016 WL 1337315, *3 (N.D. Ga. Mar. 31, 2016) (finding that the plaintiff's allegations did not support that she was discriminated against on the basis of her race: "The fact that her supervisors [were] white, standing alone, [was] insufficient to support her claim," and "her conclusory assertion that she [was] 'an African American female being denied company rights guaranteed to all employees that request it,' [was], on its own, insufficient to support a claim of discrimination."); *see also Taunton v. BLG Logistics, Inc.*, No. 14-cv-1672, 2015 WL 2402971, *2 (N.D. Ala. May 20, 2015) ("[G]eneral, conclusory allegations of race discrimination without specific facts to give the court and Defendant notice regarding upon what that claim is based ... do not meet the standards of pleading that the Supreme Court set forth in *Iqbal* and *Twombly*."); *Hale v. Mingledorff*, No. 2:13-CV-0228, 2014 WL 7012772, *13 (N.D. Ga. Dec. 11, 2014) (finding plaintiff's assertions that defendants treated similarly situated employees outside his race more favorably were conclusory and devoid of sufficient factual enhancement to plausibly suggest that defendants intentionally discriminated against plaintiff because of his race—as plaintiff did not set forth any facts in his complaint concerning defendants' allegedly more favorable treatment of other employees sufficient to raise an inference of race discrimination); *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 399 (S.D.N.Y. 2012) (granting motion for judgment

---

[4] Starks fails to allege that any similarly situated comparator outside the protected category was treated more favorably by Penske. Indeed, the factual allegations suggest that <u>both</u> Starks <u>and</u> Ohlrogge were sent home without pay for a "cooling off" period in late 2021 (*see* Doc. 1 at ¶ 18), and the Complaint is silent as to whether Ohlrogge was terminated contemporaneously with Starks in late 2022.

9

on the pleadings when plaintiff's confrontations with co-workers did not demonstrate disparate treatment in connection with his termination because they reflected, at most, the motivations of his co-workers and not those of his employer who terminated his employment and noting that personality disputes with coworkers "are not automatically transported into the realm of discrimination by an employer merely because the co-workers were of a different race").

### B. Title VII Hostile Work Environment

Starks next asserts a Title VII claim for hostile work environment on grounds that Penske "created, maintained and allowed a hostile work environment … due to his race that was permeated with discriminatory intimidation, ridicule, and insult, and that was sufficiently severe or pervasive to alter the conditions of [his] employment creating an abusive working environment." (*See* Doc. 1 at ¶ 71). To prevail on a Title VII claim for hostile working environment, a plaintiff must show (1) that he belongs to a protected group, (2) that he was subjected to unwelcome harassment, (3) that the harassment was based on his membership in the protected group, (4) that it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment, and (5) that the employer is responsible for that environment under a theory of either vicarious or direct liability. *Edwards*, 602 F.3d at 1300; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

But again, Starks has alleged no facts that would reasonably suggest that any perceived hostility was based upon his race. Starks makes no factual allegations of racial overtones or animus that might tie any conduct to race. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) ("'[Title VII] does not prohibit harassment alone … . Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category.") (citation omitted); *see also Ingram v. Sec'y of the Army*, 743 F. App'x 914, 917

(11th Cir. 2018) ("It is a bedrock principle that not all objectionable conduct or language constitutes discrimination under Title VII. 'Innocuous statements or conduct, or boorish ones' that do not relate to the race of the actor or of the plaintiff are not counted.") (citations omitted); *Corbett v. Beseler*, 635 F. App'x 809, 816 (11th Cir. 2015) ("Title VII is not a general civility code; 'ordinary tribulations of the workplace, such as sporadic use of abusive language, [race-related] jokes, and occasional teasing' cannot form the basis of a claim for actionable harassment or hostile work environment.") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Edwards*, 602 F.3d at 1301 ("Although the amended complaint does allege that Edwards was threatened, assaulted, and shunned by his Hispanic and Latino co-workers, which created a hostile work environment, it does not plausibly allege that he was harassed because he is Caucasian."); *Brannon v. Sec'y, Dep't of Veterans Affs.*, No. 22-10838, 2023 WL 1161129, *5 (11th Cir. Jan. 31, 2023) ("Hostile work environment claims do not address discrete, unpleasant acts."). Additionally, even had it been race-based, the conduct alleged in the Complaint could not be said to rise to the level of being actionable under Title VII. *See Thomas v. Auburn Univ.*, No. 3:21-CV-192, 2022 WL 428160, *5 (M.D. Ala. Feb. 11, 2022) (compiling various cases to have concluded that a racially hostile work environment was absent as a matter of law); *Chase v. Haskell Co.*, No. 1:22-CV-3941, 2023 WL 4503542, *5 (N.D. Ga. Apr. 10, 2023), *report and recommendation adopted*, No. 1:22-CV-03941, 2023 WL 3763807 (N.D. Ga. June 1, 2023) (noting that while preferential assignment of leads and invitations to meetings can be potential evidence of discrimination, such allegations in and of themselves "reflect relatively common workplace supervisory actions and are not especially abusive and insulting such as to rise to the level of harassment") (citing *Brannon*, 2023 WL 1161129 at *5-7).

### C. Title VII Retaliation

Starks additionally alleges a Title VII retaliation claim under 42 U.S.C. § 2000e-3(a), which in relevant part provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(*See* Doc. 1 at ¶ 76).  To prevail on a retaliation theory, a plaintiff thus must show (1) that he engaged in statutorily protected conduct, (2) that he suffered an adverse employment action, and (3) that there was a causal link between the protected conduct and the adverse action.  *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008).

Here, the Complaint lacks sufficient factual allegations to support a reasonable conclusion that any employment action was causally related to any protected activity.  With respect to the "harassment" by Ohlrogge, there are no allegations in the Complaint that Ohlrogge's conduct either began or worsened after Starks engaged in protected activity.  Rather, the only reasonable inference from the Complaint is that Ohlrogge's treatment of Starks arose from jealously over promotions and pay.  (*See* Doc. 1 at ¶ 11).  Moreover, even though the Complaint does allege that Starks reported Ohlrogge's conduct beginning in late 2021/early 2022, there is no indication from the Complaint that Starks characterized Ohlrogge's "harassment" as having been based on race— and generalized grievances not based on Title VII protections do not give rise to a claim for retaliation.  *See Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) ("Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII.") (emphasis in original); *see also Ghioroaie-Panait v. Rolle*, No. 3:17-CV-00698, 2020 WL 130892, *8 (M.D. Ala. Jan. 10, 2020) ("Though Plaintiff's three-

page email includes one reference to his belief that all employees should be entitled to work in a safe environment 'regardless of our nationality, skin color, accent, and other differences,' this passing reference to protected characteristics is not enough to constitute protected activity for purposes of his retaliation claim."). The first arguably protected activity alleged in the Complaint is Starks' April 2023 allegation of "white privilege." (*See* Doc. 1 at ¶ 43). But Ohlrogee's conduct had already been occurring before that alleged race-based grievance. *See Baker v. Alabama Dep't of Pub. Safety*, 296 F. Supp. 2d 1299, 1307 (M.D. Ala. 2003) ("Almost all of the 'retaliation' that Baker states he suffered occurred before he became a plaintiff in the wage and hour lawsuit ... and before his EEOC claim … . The Defendants' actions that occurred before the statutorily protected activities, as a matter of law and logic, cannot be retaliatory."); *see also Nolan v. St. Johns Cnty. Sch. Bd.*, No. 3:23-CV-1205, 2024 WL 5111699, *6 (M.D. Fla. Dec. 13, 2024) ("[A]ctivities that occurred both before and after protected activity, lack a causal connection to the protected activity (although changes in frequency or severity might indicate a causal connection).").

      As to the allegation that his suspension and termination were the result of protected activity (*i.e.*, the April 2023 race-based grievance), Starks fails to allege who the relevant decision-makers were or that those decision-makers were aware of any conduct protected under Title VII. *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.") (internal citation & alteration omitted); *see also Crayton v. Ala Dept. of Agric. & Indus.*, 589 F.Supp. 1266, 1287 (M.D. Ala. 2008) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then,

we must focus on the actual knowledge and actions of the decision-maker.") (quoting *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir.2002) (internal citations omitted)). Not only that, Starks was not placed on administrative leave until August 25, 2023 and was not terminated until September 8, 2023. (Doc. 1 at ¶¶ 55-56). Such chronology fails to support a plausible causal link to the alleged protected activity from April 2023. *See Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (explaining that "mere temporal proximity, without more, must be 'very close'") (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)); *Gilliam v. U.S. Dep't of Veterans Affs.*, 822 F. App'x 985, 990-91 (11th Cir. 2020) (affirming dismissal in part because three-month gap was too long to support an inference of causation based on temporal proximity alone); *Henderson v. City of Birmingham*, 826 F. App'x 736, 743 (11th Cir. 2020) (finding that plausible retaliation claim was not stated because the passage of seven months, without more, was insufficient to show close temporal proximity between the protected activity and the adverse employment action); *see also McCrae v. Emory Univ.*, No. 1:22-CV-3401, 2023 WL 6217372, *11 (N.D. Ga. May 24, 2023), *report and recommendation adopted*, No. 1:22-CV-3401, 2023 WL 6217376 (N.D. Ga. July 12, 2023) (finding that retaliation claims should be dismissed).

  **D.** **ADEA Claim**

  Count Four of the Complaint purports to assert a claim for age discrimination under the ADEA. (*See* Doc. 1 at ¶ 85). To state a claim under the ADEA, a plaintiff must show (1) that he was a member of a protected class (age 40 or older), (2) that he was qualified to do the job, (3) that he was subjected to an adverse employment action, and (4) that he was replaced by, or treated less favorably than, a substantially younger person. *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citation omitted); *McQueen v. Wells Fargo*, 573 F. App'x 836, 839

(11th Cir. 2014).

Except for Starks' assertion that he is forty-seven years old and thus in a protected class under the ADEA (*see* Doc. 1 at ¶ 5), the Complaint is devoid of factual allegations that relate in any way to age or age-related discrimination. No allegation is made as to the age of any coworkers or decision-makers, no substantially younger comparator is identified, and no facts otherwise are alleged that would support an inference that age was the "but-for cause" of any employment action. *See Liebman*, 808 F.3d at 1298 ("To assert an action under the ADEA, an employee must establish that his age was the 'but-for' cause of the adverse employment action.") (citation omitted). And as with the Title VII claim, any speculative allegation that Starks was being intentionally discriminated against by Penske is belied by the acknowledgement that he was actually promoted multiple times during the general period at issue.

### E. FMLA Retaliation

Finally, Count Five of the Complaint purports to state a claim for FMLA retaliation. (*See* Doc. 1 at ¶ 93). To proceed on an FMLA retaliation claim, a plaintiff "must allege sufficient facts to plausibly suggest that: '(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) that the decision was causally related to the protected activity.'" *Surtain*, 789 F.3d at 1247 (citation omitted).

It is alleged here that Starks requested FMLA leave in December 2022 and that it was granted by Penske from December 16, 2022 to April 3, 2023. (*Id*. at ¶¶ 31-32). There are no factual allegations that Penske denied reinstatement or benefits following the FMLA leave, removed any job duties or responsibilities due to FMLA leave, or terminated Starks because of FMLA leave. According to his own allegations, Starks was not placed on administrative leave and terminated until <u>over four months later</u>. As discussed in connection with the Title VII retaliation

claim, "mere temporal proximity, without more, must be 'very close.'" *Thomas*, 506 F.3d at 1364 (citation omitted); *Gilliam*, 822 F. App'x at 990-91 (affirming dismissal in part because three-month gap was too long to support an inference of causation based on temporal proximity alone); *Penaloza v. Target Corp.*, 549 F. App'x 844, 848 (11th Cir. 2013) ("[T]he time period between her request for leave and her termination was over three months, which ... is insufficient in itself to establish causation."). Without more to create an inference of causation, Starks' allegations are insufficient. *See Bess v. Dental Scheduling Ctr. Inc.*, 710 F. Supp. 3d 1295, 1308 (M.D. Ga. 2023) (finding that plaintiff's conclusory assertion that she was terminated because of her FMLA leave without facts connecting the leave to the termination decision was nothing more than an "unadorned, the-defendant-unlawfully-harmed-me accusation" insufficient to state a claim).

## V.     Conclusion

For the reasons set forth above, it is **ORDERED** that the pending motion to dismiss (Doc. 11) is hereby **GRANTED** such that this action shall be dismissed with prejudice. A final judgment will be entered separately.

**DONE** this the 30th day of September 2025

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**